In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-2722 and 99-2765

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ALFRED LEONARD WILLIAMS and
DERRICK MITCHELL a/k/a DIRKIE,

Defendants-Appellants.

Appeals from the United States District Court
for the Southern District of Illinois.
No. 97 CR 30089 - William D. Stiehl, Judge.

ARGUED OCTOBER 31, 2000--DECIDED November 16, 2001


   Before BAUER, KANNE and ROVNER, Circuit
Judges.

   ROVNER, Circuit Judge.  Alfred Williams
was convicted of conspiracy to possess
with intent to distribute cocaine and
cocaine base, in violation of the 21
U.S.C. sec. 841(a)(1). Derrick Mitchell
was acquitted of participating in that
same conspiracy, but was convicted of
four counts of distributing cocaine base
in violation of 21 U.S.C. sec. 841(a)(1).
Williams and Mitchell appeal, claiming a
number of errors in their joint jury
trial. We affirm.

I.

   Williams, Mitchell, Michael Andre
Hoffman and James Brown were all charged
with conspiracy to possess with intent to
distribute cocaine and cocaine base.
Mitchell was also charged with five
counts of distributing cocaine base,
although one of these counts was later
dismissed. Several other persons were
named as previously indicted co-
conspirators, including Willie Thomas,
Corea Thomas, Lester Smith, Jr., John
Rayford Stevenson, Terrell Burch, Robert
Hamm, Jerome White, Courtney Hoffman,
Anthony Scruggs, James Hoffman, Erskin
Scruggs, Everett Sakosko II and James
Gurges. Brown pled guilty, and the
remaining defendants went to trial before

a jury. Mitchell and Hoffman were acquitted of the conspiracy charge, Williams was found guilty of conspiracy, and Mitchell was found guilty of the remaining four counts of distribution. Williams was sentenced to life imprisonment, ten years of supervised release, a $2000 fine and a $100 special assessment. Mitchell was sentenced to 360 months of imprisonment, three years of supervised release, a $1500 fine and a $200 special assessment.

The government established at trial that Williams, a resident of El Paso, Texas, regularly supplied cocaine and marijuana to Courtney Hoffman in the East St. Louis, Illinois metropolitan area. Sometime around 1990, Courtney Hoffman was introduced to Williams in El Paso by Courtney's half brother, Michael Andre Hoffman. Michael Andre was a childhood friend of Williams. Williams supplied drugs to Courtney from the time they met until approximately January 1998. Initially, Williams used his own couriers to deliver drugs to Courtney in East St. Louis. However, in February 1992, Williams was arrested by agents of the Drug Enforcement Administration after he accepted delivery of a kilogram of cocaine in Belleville, Illinois. He was consequently charged with possession with intent to distrib-ute, and entered a written plea agreement with the government. This agreement was never filed with the court, and Williams never pled guilty because the case was dismissed when he agreed to cooperate with authorities in Illinois and Texas.

Following his troubles with law enforcement, Williams continued to supply cocaine and marijuana to Courtney Hoffman but Hoffman had to provide his own couriers. Courtney recruited a number of couriers, including his father, James Hoffman, Freddie Barnes, and Anthony and Erskin Scruggs. James Hoffman usually determined which couriers would make a particular trip. The couriers traveled to El Paso by plane, train, bus, or by driving their own cars. They usually stayed at Michael Andre's house upon arrival. They often carried large amounts of cash, strapped to their bodies, to pay Williams for drugs. After obtaining cocaine from Williams, they carried it back to Illinois either by securing it to their bodies or by secreting it in the

liners of plastic coolers. Over the years, law enforcement seized both cash and drugs from the various couriers as they traveled between El Paso and East St. Louis.

Courtney Hoffman distributed the drugs he received from El Paso to various customers in the East St. Louis area. Willie Thomas was one his main distributors. Thomas obtained cocaine in powder form from Hoffman and then converted it to crack before selling it. On approximately six occasions, Thomas received three kilograms of cocaine from Hoffman, and Thomas estimated his total take from Hoffman to be in the neighborhood of 20-25 kilograms. Thomas led a group of family members and close associates that became known as the "Wolf Pack." The Wolf Pack distributed cocaine they obtained from Thomas. Thomas had other distributors as well, including one of the defendants here, Derrick Mitchell. Thomas supplied crack cocaine to Mitchell beginning in 1991 or 1992, then ceased for a period of time when he suspected Mitchell was working for the police, and then resumed the distributor relationship by supply-ing powder cocaine to Mitchell from 1995 through 1997. On three occasions in 1993 and one occasion in 1995, law enforcement officers, using informants, made controlled purchases of crack from Mitchell in the course of investigating the Wolf Pack. These four purchases formed the basis for the four counts of distributing brought against Mitchell. The jury convicted Mitchell on all four counts of distribu-tion but acquitted him of participating in the conspiracy. The jury convicted Williams on the conspiracy count, and acquitted Michael Andre Hoffman. Mitchell and Williams appeal.

II.

Derrick Mitchell objects to his sentence on five different grounds. First, he contends the district court erred in including as relevant conduct certain drug sales that did not bear the necessary relationship to his offense of conviction. Second, he maintains that the district court erred in increasing his base offense level by two levels for possession of a firearm. Third, he argues that the court erred in increasing his criminal history category two levels for

committing the offense of conviction while under a sentence of probation. Fourth, he asserts that the court erred in increasing his criminal history category an additional level for committing the offense of conviction less than two years after being released from custody exceeding 60 days. Finally, he complains that the court erred by denying him a three-level reduction for acceptance of responsibility when the court refused to accept his attempt to plead guilty.

A.

Mitchell contends that the district court erred in relying on the Presentence Investigation Report ("PSR") in determining the drug amount to be included as relevant conduct in calculating his sentence. Mitchell objects to the unsubstantiated proffer statements upon which the PSR relied in assessing relevant conduct. He also claims the court did not state and support its findings that the uncharged conduct bore the necessary relationship to the offense of conviction. We review the district court's fact findings on the relevant conduct assessment for clear error. United States v. Cedeno-Rojas, 999 F.2d 1175, 1179 (7th Cir. 1993). We typically require that a district court explicitly state and support, either at the sentencing hearing or preferably in a written statement of reasons, its finding that the unconvicted activities bore the necessary relation to the offense of conviction. United States v. Patel, 131 F.3d 1195, 1203 (7th Cir. 1997). However, we have been willing to affirm where the record reveals that the district court relied upon the PSR and carefully considered the government's theory on the relationship between the offense of conviction and the additional conduct. Patel, 131 F.3d at 1204 (collecting cases). "[W]here it is clear that the district judge believed the required relationship to be present and the judge's implicit finding is supported by the record, we have been reluctant to remand simply because the judge failed to invoke the 'magic words' of section 1B1.3(a)(2)." Id.

Our review of the sentencing transcript shows that the district judge very carefully considered both the factual and

the legal basis for his findings on relevant conduct. At the hearing, Mitchell objected that the uncharged conduct was not related in time, place or persons involved to the offense of conviction. He conceded that the uncharged conduct involved the same drug as the charged offense. He points out that for the charged conduct, he conducted three sales in 1993 and one in 1995. The uncharged conduct occurred over a number of years, from the early 1990's through late 1997. The court accepted the government's portrayal of the evidence in support of the relevant conduct with one exception. The court found the testimony and proffer of Demiko Smith that Mitchell provided him with cocaine during the summer of 1996 through December 1996 not credible because Mitchell was incarcerated during at least a portion of that time. The court found that certain testimony by Smith was credible, but declined to include the vast majority of the cocaine that Smith attributed to Mitchell. As to the other amounts detailed in the PSR, the court found they were sufficiently related to the offense of conviction. These amounts were provided to Mitchell by Willie Thomas and James Brown, among others. Moreover, a confidential source informed law enforcement about two relatively small purchases from Mitchell. All in all, the court added up more than two kilograms of cocaine as relevant conduct. Our review of the PSR reveals that it contains an adequate factual basis for that finding. The record reveals that Mitchell was continuously involved in cocaine sales throughout the 1990's (except for a period of time when he was incarcerated), and that the sales mainly took place in the East St. Louis, Illinois area. Mitchell received the cocaine he sold from members of the conspiracy and persons associated with those charged with the conspiracy. The court explicitly stated how it was calculating the amount, which testimony it was accepting, which it was rejecting and why. Although the court did not expressly state that the events were related in time, place and persons involved, its discussion of the evidence demonstrates that these factors were well satisfied. Thus, the district court did not clearly err in finding that these additional amounts were attributable to Mitchell as relevant conduct.

B.

Mitchell next argues that the court erred in increasing his base offense level by two levels for possession of a firearm because there was no evidence that he possessed a firearm during any of the offenses of conviction. He cites United States v. Montgomery, 14 F.3d 1189 (7th Cir. 1994), cert. denied, 522 U.S. 1136 (1998), for the proposition that the firearm must be possessed during the offense of conviction in order to increase the sentence under Sentencing Guideline 2D1.1(b)(1). There was no such evidence here, according to Mitchell, and a finding that the firearm was possessed during relevant conduct is inadequate to apply the enhancement. Mitchell's reliance on Montgomery is inexplicable because even a quick review of that case reveals that the court was applying an older version of the gun enhancement guideline that has since been replaced. 14 F.3d at 1198-99 n. 9. The court there explained that at the time of Montgomery's offense, section 2D1.1 provided for a two-level enhancement if a dangerous weapon was possessed during the commission of the offense. By the time Montgomery was sentenced, the provision had been amended to require only that the weapon be possessed. The district court applied the older version, the government did not object, and on appeal, we therefore analyzed the sentence under the older guideline. We also noted, however, that under the amended version of 2D1.1, the government need no longer prove that the defendant possessed the weapon during the offense of conviction. 14 F.3d at 1199 n. 10. Rather, the government need only show that the weapon was possessed during any relevant conduct. United States v. Adams, 125 F.3d 586, 596-97 (7th Cir. 1997). As the district court found here, the government readily met that burden by presenting credible witnesses at trial who saw Mitchell in possession of a gun while selling drugs on a number of occasions. In light of that finding, the district committed no error in enhancing Mitchell's sentence two levels for possessing a dangerous weapon.

C.

Mitchell next objects to two criminal

history points the court assigned him for committing an offense while under a sentence of probation for another crime. Mitchell points put that the offense of conviction was completed by February 6, 1995, the date of the fourth sale for which he was convicted. He was not placed on probation until August 4, 1995, some six months later, and he argues that the extra points were therefore inapplicable. He concedes that under Sentencing Guideline 4A1.1(d), this addition to the criminal history subtotal should be applied if any relevant conduct takes place while under a criminal sentence. See U.S.S.G. sec. 4A1.1, Application Note 4. He also conceded at oral argument that if the district court's relevant conduct assessment was correct, then this addition was appropriate, because he engaged in some of the relevant conduct while on probation for another crime. Because we affirmed the district court's relevant conduct assessment, we must affirm the court's addition of two criminal history points pursuant to section 4A1.1(d).

Mitchell's final sentencing issue also rises or falls with the relevant conduct finding. He complains that the district court added one criminal history point for committing the offense less than two years after having been released from custody exceeding 60 days. See U.S.S.G. sec. 4A1.1(e). He was released from custody in December 1996, and the date of the final offense of conviction was February 6, 1995. Because Mitchell's relevant conduct included certain acts in 1997, the district court did not clearly err by adding one criminal history point pursuant to section 4A1.1(e).

III.

We turn now to Alfred Williams' appeal. Williams challenges both his conviction and his sentence on a number of grounds. He first maintains that the indictment should have been dismissed because it violated the terms of his 1992 plea agreement. He contends the court erred when it allowed the government to question him at trial about the details of his 1992 proffer. He argues that numerous evidentiary errors and improper prosecutorial misconduct deprived him of a fair trial. He contends that the government was improperly allowed to

strike all African-American venirepersons from the jury pool, depriving him of his right to trial by an impartial jury. He complains that the government's proof at trial established the existence of multiple conspiracies and amounted to a prejudicial variance of the indictment. He maintains his trial counsel was ineffective, and that he was entitled to a new trial on the basis of multiple errors. Williams challenges his sentence on two grounds. First, he claims that he should not have received a two-level enhancement for obstruction of justice for lying at trial. Second, he maintains that the court erred in using two prior marijuana convictions as predicates for imposing a life sentence when the conduct comprising those convictions was relevant conduct to the offense of conviction. We will address his challenges to his conviction first, and then address the sentencing issues. Williams withdrew his claim of ineffective assistance of counsel at oral argument, explaining that he merely wished to preserve this issue, and feared waiving the claim to the extent his attorney's ineffectiveness was apparent from the record. We believe these claims are best brought in a collateral proceeding where the record can be fully developed, and not on direct appeal when most of the pertinent information is not yet in the record. United States v. Taglia, 922 F.2d 413, 419 (7th Cir. 1991). We will therefore treat the claim of ineffective assistance as withdrawn.

A.

Williams argues first that the indictment should have been dismissed because it violates the terms of his 1992 plea agreement. Williams concedes that he did not raise this problem before the district court, and that we therefore review the issue for plain error. Fed. R. Crim. Pro. 52(b). As we discussed, in 1992, Williams was arrested after accept ing delivery of a kilogram of cocaine in Belleville, Illinois. He entered into a plea agreement which, by its terms, contemplated that he would enter a guilty plea relating to the charges arising from that arrest. Williams agreed to cooperate with the government in its investigations and prosecutions in southern Illinois and elsewhere. In exchange, the government agreed not to prosecute Williams for any

crimes of which it became aware by virtue of his cooperation. Subsequently, Williams agreed to cooperate with law enforcement in Texas and Illinois, and the charges were dismissed. Thus, Williams never pled guilty as contemplated by the agreement. Williams now maintains that he did all he was required to do under the plea agreement, and that the government breached its duty by prosecuting him in this case. The government contends that Williams waived this argument by failing to raise it in the district court.

The government mistakes waiver for forfeiture, and does so for every issue that Williams raises for the first time on appeal. This is a common error, and so we will repeat the rule. Waiver is the intentional relinquishment or abandonment of a known right. United States v. Olano, 507 U.S. 725, 733 (1993). It differs from forfeiture, which is simply the failure to make a timely assertion of a right. Id. "Waiv-er extinguishes the error and precludes appellate review." United States v. Staples, 202 F.3d 992, 995 (7th Cir. 2000). Forfeiture permits plain error review. Id. A common distinction we draw between waiver and forfeiture is that waiver comes about intentionally whereas forfeiture occurs through neglect. Id. See also Fed. R. Crim. Pro. 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). On each issue that the government claims waiver here, Williams in fact simply neglected to raise the issue in the district court, and we will therefore apply plain error review in each instance.

The government argues that, even if Williams did not waive the issue, the district court did not plainly err. The government maintains that the plea agreement was never approved by the court, and Williams never pled guilty as anticipated, and thus the agreement would not require dismissal of the superseding indictment. See United States v. Whitaker, 127 F.3d 595, 608-09 (7th Cir. 1997). In Whitaker, the defendant entered into a plea agreement with the government. At first, the defendant's attorney failed to present the plea to the court because of a scheduling conflict. The government sent two letters

to the defendant's counsel, warning that if the agreement was not presented to the court by a certain date, the government would bring the case before a grand jury. The defendant never presented the plea agreement to the court, and a grand jury returned a superseding indictment. The defendant pled guilty to that indictment without a plea agreement, but on appeal sought specific enforcement of the earlier agreement. We noted that the original plea agreement was never presented to court and no judgment was ever entered on the plea. We held we were unable to entertain any arguments as to the benefits the defendant thought he would receive as a result of the first negotiations because that deal never came to fruition. 127 F.3d at 609. We further held that the reason that agreement was not reduced to a judgment was beyond the scope of our review. Id. The same is true in the instant case. Williams is not entitled to the benefit of the plea agreement because he never pled guilty. The reason the agreement was not reduced to a judgment is beyond the scope of our review at this point. Moreover, the agreement purported only to protect Williams from prosecution for crimes that became known to the government by virtue of his cooperation, and Williams makes no showing that the crimes of which he was ultimately convicted became known to the government in this fashion.

B.

Williams next complains that the district court erred in allowing the government to question himself and other witnesses about the details of his 1992 proffer. He raises two objections to the government's use of the proffer. First, he claims the government agreed in the proffer not to use any statements or information given by him in any criminal case during the government's case-in-chief. Second, he contends that, under the agreement, the government could use the proffer on cross-examination only if Williams' testimony was materially different from the proffered information. In his reply brief, Williams abandons the first claim, conceding that the government did not raise these issues in its case- in-chief. The government argues that we should affirm the district court outright because Williams does not cite any authority in support of his theory,

and failed to include the proffer in the record here or below. Williams counters that he attached the proffer letter to a motion in limine before the district court. This may well be true, but the parties did not include the motion in limine in the record on appeal, and we are therefore left to decide whether Williams' testimony differed materially from a document we do not have before us. The district court does refer to the proffer document during the trial, and so it appears the government is mistaken in its claim that Williams did not produce the proffer agreement and transcript to the district court. See Tr. Vol. IX, at 48.

We believe, in these limited circumstances, we can resolve this issue without ordering the parties to supplement the record. The government does not dispute Williams' characterization of the proffer agreement, and thus we will assume that the agreement allowed the government to question Williams about the proffer only if his testimony at trial differed in a material way from the proffered information. The parties also seem to agree about the factual basis for the district court's decision to allow questioning regarding the proffer. During Williams' direct testimony, he stated that, when he was arrested in 1992, he wanted to tell law enforcement "the truth about everything." He testified on cross-examination that he never opened the package of cocaine he had shipped up to Belleville, Illinois. The government then sought to question him regarding what he told the agents at the time of the proffer. In particular, quoting from the proffer at trial, the government pointed out that Williams admitted opening the package shortly before his arrest. Thus, Williams' testimony at trial did contradict the information he supplied in the proffer. The detective who took the proffer had testified at trial consistently with the proffer, stating that Williams admitted opening the package, and also that a sensor placed in the package prior to the controlled delivery indicated the package had been opened. We may infer from this testimony, and Williams does not dispute these facts, that in the proffer he admitted opening the package and at trial he denied it. Presumably, the purpose of

this denial is to disclaim knowledge of the contents of the package, and thus deny that he knowingly received a kilogram of cocaine. In the very least, this discrepancy called his credibility into question, and the court did not err in determining that his testimony differed in a material fashion from his proffer. The government was therefore free under the agreement to question Williams about the particulars of the proffer at trial. See United States v. Griffin, 84 F.3d 912, 919 (7th Cir. 1996) (where a proffer letter allows for impeachment if the defendant testifies inconsistently, the statements are admissible for that purpose).

C.

Williams next attacks three evidentiary rulings by the district court, addressing each separately, and then contending that the cumulative effect of these errors deprived him of a fair trial. We review the district court's evidentiary rulings for abuse of discretion. United States v. Wiman, 77 F.3d 981, 985 (7th Cir. 1996).

1.

In the first instance, Williams sought to introduce probation records from Texas purportedly demonstrating that he was in New Jersey cooperating with authorities in a drug investigation on May 17, 1995. Several witnesses had testified at trial that on that same date, Freddie Barnes and James Hoffman traveled to Texas with $89,000 strapped to their bodies to buy drugs from Williams. Williams sought to contradict this testimony with evidence that he was not in Texas at the time. Williams did not obtain the Texas probation records until after he rested his case. He then sought to reopen his case for the limited purpose of admitting them into the record. He proposed to read two parts of the document into the record in the same manner the government had admitted a death certificate by reading portions of it into the record.

We have reviewed the documents submitted and the trial transcript detailing Williams' intended use of the documents and the government's objections. The documents consist of a log of contacts relating to Williams, and a number of letters purporting to allow him to travel

at certain times to certain places. The log is not labeled except for Williams' name, and it is not signed. Several paragraphs of the five-page log are blacked out. The five travel letters, nominally issued by the probation office in El Paso, Texas, each purport to authorize Williams to travel to Camden, New Jersey on five different dates. The only one relevant to Williams' defense authorizes him to travel to Camden, New Jersey on May 14, 1995 and requires him to return no later than May 18, 1995.

Williams' trial counsel initially argued to the court that the records established that Williams was in New Jersey on May 17, 1995. The government protested that the records at most established a time frame in which Williams may have been in New Jersey. The government also complained that the records consisted of multiple levels of hearsay, and that Williams had not produced any witness who could authenticate them. Williams' counsel wished to rely on the letter authorizing Williams to travel, and a log entry detailing a phone call from a Detective Nuel, dated May 18, 1995, stating that Williams was in New Jersey working with Nuel and the state police. The government pointed out that the May 18 entry did not state when Williams was in New Jersey, only that he had been there to appear in court for legal matters pending against him. Without objection or correction from Williams' counsel, the government stated that the documents did not prove that Williams was in New Jersey on any particular date, but rather showed at most that he had been given permission to be there during that time. Tr. Vol. XI at 2-5. The government adds on appeal that the value of the documents to Williams' case is questionable because the drug buyers who testified at trial admitted that they often, on arriving in Texas, had to wait a day or two for Williams to appear with the goods. Thus the fact that Williams was not present in Texas when they arrived with the cash was not dispositive.

Contrary to the government's suggestion, we agree with the district court that the records had some value and rele-vance to Williams' case. However, the district court did not abuse its discretion by refusing to admit the records when

Williams was unable to lay a proper foundation for them. He produced no witnesses to authenticate the records, and the court was troubled that the government would be unable to cross-examine anyone regarding the meaning of the various notations. Williams concedes on appeal that the records were not certified and thus not admissible under Federal Rule of Evidence 902. He now contends they could have been admitted under Rule 807, the "residual exception." This rule provides, in relevant part, that a statement not covered by Rules 803 or 804 but having equivalent circumstantial guarantees of trustworthiness is not excluded by the hearsay rule if the court determines that certain conditions are met. Williams claims all of the conditions were met here, and that he was deprived of his right to present a defense when the court refused to admit the records. There are any number of problems with this argument, beginning with the fact that Williams did not raise it below, and thus has forfeited it. In any case, we will review it for plain error. The rule requires that "a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant." Fed. R. Evid. 807. Of course, Williams gave the government no notice at all, and did not even obtain the documents until the trial was well under way. Moreover, he has never identified the proponent of the log pages he submitted. The district court did not plainly err in refusing to admit the documents under these circumstances.

2.

Williams next objects that the court erred in admitting hearsay statements of testifying co-conspirators, and hearsay statements of co-conspirators that were not in furtherance of the conspiracy. In particular, he complains that the court allowed the government to read aloud a letter and affidavit from Anthony Scruggs, stating that Scruggs had never seen Williams with any drugs and that he had never heard Courtney Hoffman talk

about any drug deals with Williams. Scruggs testified at trial that he lied in the affidavit. Williams also objects to the admission of hearsay testimony (1) from Willie Thomas, stating at trial that Courtney Hoffman told Thomas that Hoffman got his cocaine from "his little brother's people" in El Paso; (2) from Willie Thomas, testifying that Courtney Hoffman told him the couriers sometimes were apprehended by law enforcement while en route to the East St. Louis area, and that they lost the drugs or money they were carrying on these occasions; (3) from Freddie Barnes, testifying that James Hoffman told him Williams was the person supplying the drugs; (4) from Detective Robert Thompson of the St. Louis County Police Department, who stated at trial that he interviewed James Hoffman at the airport, that Hoffman denied he was traveling with Barnes, that the bundles of money found strapped to his body during a consensual search were intended as an investment in a grocery store with his son; (5) from Detective Thompson, who testified that Barnes admitted at that same interview that the cash found strapped to Barnes' body in another consensual search was obtained from Hoffman and was drug money; (6) from Sergeant Sean Moore of the Missouri State Highway Patrol, who testified that he stopped Hoffman and Barnes on the highway, that he discovered two kilograms of cocaine in the car during a consensual search, and that Hoffman told him they were returning from a trip to El Paso, Texas; (7) from Corea Thomas, who stated at trial that his brother (Willie Thomas) told him he was obtaining cocaine from Courtney Hoffman, and that Hoffman was obtaining it from Texas; (8) from Corea Thomas, who testified that his brother told him he had supplied cocaine to Demiko Smith; and finally (9) from Lester Smith, Jr., who testified that Willie Thomas complained that Courtney Hoffman and a man named Bob each allowed some of his money to be seized, and that Willie Thomas told him that Hoffman got his cocaine in Texas and Mexico. Williams objected at trial to just one of the statements he now argues are inadmissable hearsay. He objected to Detective Thompson's testimony that Barnes admitted the cash strapped to his body was drug money and that they were heading to El Paso to meet with Hoffman's son. He objected on the ground that Barnes was no

longer acting as a member of the conspiracy when he made these admissions to the police. The court overruled the objection.

We will review for plain error the admission of the statements to which Williams did not object at trial. "Plain" in this context is synonymous with clear or obvious. At a minimum, this means the error must be clear under current law. Olano, 507 U.S. at 734. Moreover, the error must affect substantial rights. In other words, it must be prejudicial and must have affected the outcome of the district court proceedings. Id. We begin with the affidavit. The government contends the affidavit was admissible under Federal Rule of Evidence 801(d)(1)(A). That rule excludes from the definition of hearsay any statement made by a declarant who testifies at trial and is subject to cross-examination, but only if the statement is inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing or other proceeding, or in a deposition. We have held that, even when an affidavit is taken under an oath administered by an IRS special agent, the investigative interview that generated the affidavit was not shown to be a "proceeding" for the purposes of the rule, and the affidavit was therefore not admissible under this rule. United States v. Micke, 859 F.2d 473, 477 (7th Cir. 1988). There is no indication in this record that Anthony Scruggs wrote the affidavit in conjunction with a "proceeding" as contemplated by Rule 801(d)(1)(A), and so that rationale does not support its admission.

The other theory proposed by the government in support of admitting the document is that the affidavit tended to impeach the witness, and the government sought, for strategic reasons, to reveal its own witness' lie to the jury before the defendant had an opportunity to do so. As such, the government argues that the affidavit was admissible under Rule 801(d)(1)(B). In other words, the government sought to reveal the conflicting affidavit to the jury in order to soften the blow when the jury discovered the government's witness had lied before. But Rule 801(d)(1)(B), which excludes from the definition of hearsay

prior consistent statements offered to rebut an express or implied charge of recent fabrication, does not support the admission either. As the government concedes, the affidavit contained statements that were contrary to Scruggs' testimony at trial.

Although the government's arguments do not carry the day here, we find the district court did not plainly err in allowing admission of the affidavit because it was not hearsay at all. Rule 801(c) defines hearsay as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The affidavit clearly was not introduced to prove the truth of the matter asserted. In the affidavit, Scruggs stated that he had never seen Williams with any drugs and that he had never heard Courtney Hoffman talk about any drug deals with Williams. If true, the affidavit would tend to exonerate Williams, and so the government hardly sought to introduce it for the truth of its contents. See United States v. Limehouse, 950 F.2d 501, 503 (7th Cir. 1991). To the contrary, the government sought to introduce the affidavit in order to have Scruggs explain why it was not true, and why he lied at that time. The letter came in for the same purpose, and thus the court did not plainly err in admitting the letter as well.

That leads us to the various statements made by co-conspirators. The government contends that these statements are not hearsay under Rule 801(d)(2)(E). That rule excludes from the definition of hearsay a statement by a co-conspirator during the course and in furtherance of the conspiracy. That rule applies to nearly all of the statements cited by Williams, and so we find that the court did not err in admitting those statements. The only possible exception is the one statement to which Williams objected at trial. Williams objected to Detective Thompson's testimony that Barnes admitted that the cash found strapped to Barnes' body in a consensual search was obtained from Hoffman and was drug money. Williams maintained at trial that Barnes was not speaking in furtherance of the conspiracy because he was talking to law enforcement at the time of the statement. We agree with the

defendant that Barnes' admissions to law enforcement that the money was "drug money" were not made in furtherance of the conspiracy and thus were not admissible against Williams under Rule 801(d)(2)(E). See United States v. Santos, 20 F.3d 280, 286 (7th Cir. 1994). However, we believe in light of the other overwhelming evidence that this money was drug money destined for Texas, that this error was at worst harmless. Id. Because we find that the district court did not err, with the exception just stated, in its various evidentiary rulings, we also reject Williams' contention that the cumulative effect of any evidentiary errors deprived him of a fair trial.

D.

Williams testified in his own defense, and he complains that much of the government's cross-examination of him consisted of improper material relating to prior bad acts and prior convictions. He concedes that he did not object to these questions at trial, but maintains that the district court had an independent duty under Rules 403, 404(b) and 609 to weigh the probative value of this evidence against its prejudicial effect, and exclude it if the prejudice outweighed the probative value. He also maintains that the court erred in refusing him a Rule 404(b) jury instruction, limiting the use of this information by the jury. The government replies that Williams opened the door to this cross-examination when he testified about his prior convictions during his lawyer's direct examination of him. Because Williams did not object to this questioning at trial, we will review for plain error only. United States v. White, 222 F.3d 363, 369 (7th Cir. 2000).

A survey of Williams' direct examination demonstrates that the government is correct that Williams raised each of these prior convictions himself in his case-in-chief. Williams first admitted that in 1992 he signed for a package while staying at the home of Craig Hoffman's mother, and that he was arrested as a result of that incident. Tr. Vol. IX, at 12. He conceded he had also "got in trouble in El Paso," that he had been "set up" and was caught selling drugs to an undercover police officer. Tr. Vol IX, at 13. He also told the jury

he was charged in a marijuana conspiracy in Arizona, to which he pled guilty. Finally, he conceded that while he was on probation for the Arizona conviction, he was arrested in New Jersey for another marijuana conspiracy. Tr. Vol IX, at 19-20. As with the El Paso incident, Williams claimed to have been "set up" in New Jersey. In describing each incident, Williams revealed only selected details, tried to distance himself from responsibility, and claimed to be cooperating with the police whenever cooperation was requested of him following an arrest. Under these circumstances, it was not erroneous for the district court to allow the government to cross-examine Williams regarding each incident. White, 222 F.3d at 370. Ordinarily, on cross-examination, the details of the prior convictions should not be exposed to the jury. Id. However, "where a defendant attempts to explain away the prior conviction during direct examination by giving his own version of events, he has 'opened the door' to impeachment by the prosecution on the details of the conviction." Id. The prosecution here tailored its questions to Williams' statements on direct, and we see no error in the district court allowing this questioning, much less plain error./1 Nor do we find any error in the district court's failure to give a Rule 404(b) instruction to the jury regarding this evidence.

E.

Williams next contends that the government engaged in racial discrimination in the jury selection process, impermissibly striking all African-American venire persons from the panel. Although the government struck all four African-American members of the jury pool, Williams challenges only the ouster of Juror P, maintaining that the government's reason for striking him was based entirely on speculation and is therefore suspect./2 Although Williams claims that striking the other three African-American venire persons established a pattern of racial discrimination, he seems to concede that the government established adequate-race-neutral explanations for its exercise of peremptories in those three cases./3 Our review of the record shows that government struck the first because two

of her children had been prosecuted for drug offenses, the second because her brother had been prosecuted by the very Assistant United States Attorney who was prosecuting the instant case, and the third because he was extremely nervous and knew some of the witnesses. These are adequate race-neutral explanations for the strikes. We turn then to the reasons given for Juror P. Juror P revealed that he was single, a high school graduate, and was a security officer residing in East St. Louis. The government did not ask Juror P any more spe-cific follow-up questions. Tr. Vol. I, at 9. In its general questions to the jury, the court inquired whether anyone in the pool was acquainted with any witnesses and Juror P indicated that he was not.

The government told the trial court that it had tried to obtain more information about Juror P because the police officers in the case had indicated that a family sharing Juror P's last name was notorious for its involvement in drugs in East St. Louis and Centreville. Because the government obtained Centreville addresses for Juror P and for the company that employed him, and because Centreville was a close community where many of the witnesses were notorious, the government believed that Juror P might be acquainted with the witnesses or would recognize them when he saw them. Tr. Vol. I at 125–26. Williams' counsel objected to the "extraneous information brought in on [Juror P] that we have no idea about." Tr. Vol. I at 126. The court disagreed that the government was required to file some sort of discovery protocol in order to strike a juror, and found that the reasons given were adequate and non-discriminatory. The court therefore denied Williams Batson challenge. See Batson v. Kentucky, 476 U.S. 79, 85-86 (1986).

Because the government excluded all four African-American members of the jury pool, the district court did not err in requiring the government to state a race-neutral explanation for its exercise of peremptories for these jurors. See Mahaffey v. Page, 162 F.3d 481, 485 (7th Cir. 1998) (inference of discrimination may arise when one party uses its peremptories to strike each and every African-American from the venire). The government's reasons "need not rise to

the level justifying exclusion for cause, [but] must be clear and reasonably specific, presenting legitimate reasons that are related to the particular case." United States v. Mojica, 984 F.2d 1426, 1449 (7th Cir. 1993) (citation omitted). "Adequate explanations for exercising a peremptory strike may include a prosecutor's 'intuitive assumptions that are not fairly quantifiable.'" Dunham v. Frank's Nursery & Crafts, Inc., 967 F.2d 1121, 1125 (7th Cir. 1992). The trial court must then determine whether the defendant has established that the exclusion of jurors was based on discriminatory criteria, and we will uphold that credibility-based determination unless it is clearly erroneous. Mojica, 984 F.2d at 1449. The district court here found the government's reasons to be adequate and race-neutral. We agree that the reason stated is clear, specific and related to the case. The government had some information that Juror P could be related to a family known to the local police for its drug activities. Juror P resided in a relatively small town, and the government was concerned that, although he claimed not to recognize any of the names on the witness list, he might recognize witnesses once he saw them. In the middle of the jury selection process, the government obviously had no time to investigate and verify this suspicion regarding Juror P. The district court believed the government's stated reasons to be its real reasons, and we see no reason to second guess that judgment. We therefore affirm the district court's ruling on the Batson challenge.

F.

   Williams next claims a fatal variance between the indictment and the proof at trial. In particular, he complains that only one conspiracy was charged but that multiple conspiracies were proved at trial. Because no limiting instruction was given, Williams believes that he was prejudiced. We note first that Williams did not proffer any limiting instruction at trial, and so we review that component of his argument for plain error. Even on appeal, Williams fails to specify what instruction he believes the district court was required to give. He complains of possible jury confusion caused by a failure to instruct the jury regarding

the limited use of evidence relating to other defendants, and confusion caused by the number of conspirators charged and the number of conspiracies proved.

A conspiracy variance claim is really "a challenge to the sufficiency of the evidence supporting the jury's finding that each defendant was the member of the same conspiracy." United States v. Townsend, 924 F.2d 1385, 1389 (7th Cir. 1991). Whether a single conspiracy exists is a question of fact and hence is a question for the jury. Id. Even if the evidence arguably established multiple conspiracies, there is no material variance from an indictment charging a single conspiracy if a reasonable trier of fact could have found beyond a reasonable doubt the existence of the single conspiracy charged in the indictment. Id. See also United States v. McAllister, 29 F.3d 1180, 1186 (7th Cir. 1994). Even if we were to find a variance, Williams would also have to show that he was prejudiced by the variance. United States v. Curtis, 37 F.3d 301, 305 (7th Cir. 1994).

Williams argues that it would be almost impossible to determine how many conspiracies were proved here. He names as separate conspiracies the Wolf Pack organization, Willie Thomas' multiple suppliers, Courtney Hoffman's suppliers in Fort Worth, Dallas and Mexico, and Maurice Williamson's connections in California. He points out that both of Williams' co-defendants at trial were acquitted of the conspiracy charges. We do not review the evidence de novo when we review a claim of variance. Because the question of a variance is factual, we must determine, viewing the evidence in a light most favorable to the government, whether the evidence is sufficient to support the jury's determination. United States v. Magana, 118 F.3d 1173, 1186 (7th Cir. 1997). With that standard in mind, we turn to the indictment first and then to the proof at trial. The indictment alleged that Williams, together with Mitchell, James Brown, Michael Andre Hoffman and a host of previously indicted co-conspirators, conspired to possess and distribute cocaine and crack cocaine in the Southern District of Illinois from approximately 1990 to 1998. R. 288. Mitchell and Michael Andre Hoffman were acquitted of

the conspiracy charge. Brown pled guilty to conspiracy, as did a number of the previously indicted co-conspirators. At trial, the government showed that Williams and Courtney Hoffman had a distributor/supplier relationship from 1990 to January 1998. Williams initially used his own couriers to deliver marijuana and cocaine to Hoffman in the East St. Louis area, but after Williams was arrested in 1992, Hoffman had to supply his own couriers to transport the drugs from Texas to Illinois. Hoffman's couriers traveled to Texas by various modes of transportation, with cash strapped to their bodies to use as payment to Williams for the drugs. Hoffman distributed the drugs in Illinois through a number of distributors. One of his main distributors was Willie Thomas, who led a group known as the "Wolf Pack." The Wolf Pack and others distributed the drugs further, to street level customers. The government posits that this evidence established a single conspiracy to distribute cocaine, extending from the supplier in Texas, in this case Williams, to mid-level distributors in the East St. Louis area, to street level dealers. We are inclined to agree with the government that, although the evidence may have shown a number of subgroups involved in the conspiracy, that fact is not dispositive. "The crime of conspiracy focuses on agreements, not groups." Townsend, 924 F.2d at 1389. The government need not prove that Williams conspired with all of his co-defendants or all of the previously indicted co-conspirators, but only that he joined the agreement. Id. There was enough here for the jury to conclude that a number ofpeople had an agreement to distribute drugs in East St. Louis, and that Williams joined that agreement. A jury instruction regarding multiple conspiracies might have been helpful and appropriate here but it was not necessary because Williams has not shown he was prejudiced by the absence of the instruction.

G.

  After the verdict, Williams moved for a new trial on the basis of nine asserted errors, four of which we have already addressed above and will not revisit here. On appeal, he abandons four of the remaining five issues, and claims only

one additional problem entitling him to a new trial. He maintains that the government was obligated to provide the Texas probation records to him pursuant to its obligation under Brady v. Maryland, 373 U.S. 83 (1963). He complains that once he subpoenaed the records, the Marshall's office in Texas took four days to walk a subpoena down the hallway to serve it. By then it was too late for him to put the records to good use. We review the district court's denial of Williams' motion for a new trial for abuse of discretion. United States v. Linwood, 142 F.3d 418, 422 (7th Cir. 1998). A Brady violation occurs only if material evidence is withheld by the prosecution. United States v. Stott, 245 F.3d 890, 901 (7th Cir. 2001). Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Id., citing United States v. Bagley, 473 U.S. 667, 682 (1985). In section II.C.1. above, we found that, although the records had some relevance to Williams' defense, the district court did not err in refusing to admit them because Williams was unable to lay a proper foundation for them. The records documented periods of time when Williams was given permission to travel, facts known to Williams well in advance of the trial. In light of the district court's proper exclusion of the records, and because nothing in the records would have otherwise aided Williams in the preparation of his defense, we cannot find that the probation records were material to Williams' defense. We therefore hold that Williams was not entitled to a new trial on the basis of a Brady violation or on the basis of any of the arguments he raised earlier.

H.

That brings us to Williams' objections to his sentence. He maintains first that the court erred in enhancing his offense level two points for obstruction of justice. He contends that it was clear error to find that he lied at trial when his testimony was substantially the same as his co-defendant Michael Andre Hoffman, who was acquitted. He also faults the court for relying on two prior controlled substance convictions in other jurisdictions as predicates for a life

sentence under 21 U.S.C. sec. 841(b)(1)(A) because the conduct involved in these convictions was part of the same conspiracy for which he was convicted here. We will consider the obstruction of justice enhancement first.

Section 3C1.1 of the Sentencing Guidelines authorizes the trial court to enhance the defendant's offense level by two levels if it finds by a preponderance of the evidence that the defendant willfully obstructed or impeded the administration of justice during the prosecution of the offense of conviction. United States v. Godinez, 110 F.3d 448, 456 (7th Cir. 1997). The notes to that Guideline list "committing, suborning, or attempting to suborn perjury" as examples of conduct warranting the enhancement. Id. Consequently, when a defendant testifies falsely at his own trial concerning a material matter with the willful intent to provide false testimony rather than as a result of confusion, mistake or faulty memory, the court may apply the enhancement. Id. A simple denial of guilt is not a sufficient basis for the enhancement, nor is a guilty verdict following the defendant's testimony on his own behalf. Id.; United States v. Lozoya-Morales, 931 F.2d 1216, 1219 (7th Cir. 1991). When the defendant challenges the application of the enhancement, the district court must review the evidence and make an independent finding that the defendant committed conduct, such as perjury, warranting the enhancement. Godinez, 110 F.3d at 456. "We review de novo the district court's application of the [G]uidelines, and we review factual findings in the sentencing phase for clear error." United States v. Macillas, 183 F.3d 682, 709 (7th Cir. 1999).

Williams did challenge the district court's application of the obstruction enhancement, and the district court made findings to support its decision:

All right, I have had an opportunity to glance at a couple of the things I wanted to. I believe that in Mr. Williams' testimony, by his denial of the code that was obviously being used in the tapes to arrange the purchase of 5 or 6 kilograms of cocaine, by the detailed denial of the testimony of a number of his co-conspirators affecting his participation,

and testimony about his participation in the conspiracy, and by his claim, the defendant's claim, that his only involvement in drugs with this conspiracy during the life of this conspiracy, other than the one kilogram in the 1992 Belleville delivery to which he has admitted, his only involvement was done in cooperation with law enforcement officials, that through his testimony on all of those subjects he provided materially false information that if believed could tend to and would tend to influence or affect the issues under determination, and I find that the probation officer's assessment of the 2 level enhancement for obstruction of justice is proper and I overrule the defendant's objection number 2.

Tr. July 6, 1999 at 32-33. These findings are sufficient to apply the enhancement. The court was not simply relying on the jury's guilty verdict to find that Williams perjured himself. Nor was the court applying the enhancement because of a simple denial of guilt. Rather, the court applied the enhancement because the court found that Williams provided intentionally false information on several material matters. Namely, Williams lied about transactions occurring outside his cooperation with law enforcement, and lied about the code he used on the telephone to communicate with other conspirators about drug sales. He also lied about his participation in the conspiracy. All of these were material to the charge of conspiring to possess with intent to distribute cocaine, and the court did not err in applying the obstruction of justice enhancement.

Finally, Williams challenges the court's use of two state court felony convictions for marijuana offense as predicate offenses for establishing that he is a career offender under Sentencing Guideline sec. 4B1.1. In 1994, Williams pled guilty to conspiracy to possess with intent to deliver marijuana in Arizona. He was sentenced to probation with special conditions, and eventually his probation was revoked based on a new drug conviction in New Jersey. Williams pled guilty to the New Jersey offense, possession with intent to distribute a dangerous controlled substance, in 1995. He now argues that the conduct comprising

these convictions occurred during the same time period as the charged conspiracy, and were part of the same scheme. As such, he contends the court erred in using these offenses as predicates for career offender status. Williams concedes that this Court has de cided this issue against him, and raises it merely to preserve it for further appeal. See United States v. Garcia, 32 F.3d 1017 (7th Cir. 1994). Given this concession, and because Williams offers no reason for us to reconsider our prior ruling, we will not consider the issue further.

IV.

For all the reasons stated above, we affirm the convictions and sentences of both Alfred Williams and Derrick Mitchell.

AFFIRMED.

FOOTNOTES

/1 Williams also complains that the government improperly questioned him regarding his communi- cations with his attorney, a car loan from his brother, his involvement in a conspiracy, and a not guilty plea he entered in 1992. We have considered Williams' other complaints about improper cross-examination and find them equally unavailing. We find no reversible error.

/2 We will refer to this juror as Juror P given the nature of the government's reasons for excluding him.

/3 Williams did object at trial that two or three of the excluded witnesses had specifically indicated that they would not be biased in their judgments based on the factors enumerated by the govern- ment. He does not raise that objection on appeal, and we will therefore give it no further consid- eration.