# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 02-1411, 02-1607 & 02-3641

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

CHRISTOPHER B. MESSINO, CHRISTOPHER R.
MESSINO, and CLEMENT A. MESSINO,

*Defendants-Appellants.*

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 93 CR 294—**David H. Coar**, *Judge.*

_____

ARGUED FEBRUARY 23, 2004—DECIDED AUGUST 31, 2004

_____

Before BAUER, EASTERBROOK, and KANNE, *Circuit Judges.*

BAUER, *Circuit Judge.* Most of the facts of the trial in this case are discussed in numerous prior opinions of this court. *United States v. Michelle's Lounge,* 39 F.3d 684 (7th Cir. 1994); *United States v. Messino,* 55 F.3d 1241 (7th Cir. 1995); *United States v. Underwood,* 122 F.3d 389 (7th Cir. 1997); *United States v. Michelle's Lounge,* 126 F.3d 1006 (7th Cir. 1997); *United States v. Messino,* 181 F.3d 826 (7th Cir. 1999). For our present purposes, we can reduce the discussion to the following:

## I. Background

From 1980 to 1991, Christopher R. Messino ("Dick"), Christopher B. Messino ("Chris"), Clement Messino ("Clem"), and others were embroiled in a wide-ranging conspiracy to distribute, and possess with intent to distribute, cocaine.[1] The rough contours of the conspiracy involved purchasing kilogram-quantities of cocaine in Florida and transporting it to Chicago for distribution.

On November 18, 1993, a federal grand jury returned an indictment made up of 13 counts. At issue in this appeal, Count One charged Dick, Clem, Chris, Michael Homerding, Donald Southern, William Underwood, Blaise Messino, Paul Messino, Thomas Hauck, Gray Chrystall, Daniel Shoemaker, and Lawrence Thomas with conspiracy to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. Counts eight, nine and twelve charged Chris with distributing cocaine in two separate transactions, and with engaging in interstate travel in aid of the distribution conspiracy. Count eleven charged Clem with money laundering in connection with his purchase of real estate in Monee, Illinois.

After a convoluted procedural course through the courts, including three trials, the defendants in this case were convicted on many of the counts in the indictment. They now appeal various aspects of their convictions and/or sentences.

## II. Discussion

### A.  Christopher R. Messino ("Dick")

*Blakely* and *Booker* explain that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge

---

[1]  As all three defendants have the same last name, we use their familiar names to distinguish among them.

may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" *Blakely v. Washington*, 124 S. Ct. 2531, 2537 (2004); *United States v. Booker*, 375 F.3d 508, 2004 WL 1535858, at *2 (7th Cir. July 9, 2004). In this case, the jury found Dick guilty of conspiring to distribute and possession with the intent to distribute at least 500 grams but less than five kilograms of cocaine. At sentencing however, the judge found, by a preponderance of the evidence, that Dick was responsible for a conspiracy involving 95 kilograms of cocaine. The judge also made findings when he imposed enhancements for obstruction of justice and for being an organizer. That puts this case squarely in the holdings of *Blakely* and *Booker*. We therefore, vacate Dick's sentence and remand the case for resentencing which comports with this opinion.

## B. Christopher B. Messino ("Chris")

Chris makes two arguments in his only brief to this court, filed on July 9, 2003; both concerning his sentencing enhancements. In reviewing these claims as presented, we review the findings of fact for clear error and application of those facts to the guidelines de novo. *United States v. Irby*, 240 F.3d 597, 599 (7th Cir. 2001); *accord United States v. Bass*, 325 F.3d 847, 850 (7th Cir. 2003) ("This court reviews de novo whether the district court addressed the proper factors in imposing an obstruction of justice enhancement, and reviews for clear error the court's findings of fact"). We will find a district court's findings clearly erroneous if we are left with the firm and definite conviction that the court made a mistake. *Id.*

### 1. Obstructing or Impeding the Administration of Justice

Chris begins with an argument that the trial court erred in imposing an obstruction of justice enhancement. The first

part of the argument centers on the fact that his offending statements were immaterial to *his own* sentence and conviction because they were made during his testimony at the trial of co-defendants Dick and Clem Messino.

Chris was properly sentenced under the 2000 guidelines. This court has noted that "[a]n enhancement under § 3C1.1 [Obstructing or Impeding the Administration of Justice] may be imposed only if the court finds that the defendant willfully obstructed or impeded the investigation, prosecution, or sentencing by way of conduct related to the defendant's offense or a closely related offense." *United States v. King*, 338 F.3d 794, 799 (7th Cir. 2003). This language tracks the guideline itself. U.S.S.G. § 3C1.1. We have construed "closely related" offenses to include a co-defendant's trial. *United States v. Gonzalez*, 319 F.3d 291, 299 (7th Cir. 2003). Therefore, it matters not that the offending statements may have been immaterial to *his own* guilt or sentencing. So, this application of the judge's findings to the guidelines was proper.

The next question is whether the district court's findings of fact were clearly erroneous. In imposing the obstruction enhancement at Chris's sentencing, the district court judge said, "I cannot square [Chris's] trial testimoney at Dick and Clem's trial with either his statements at the plea hearing or with his statements in the tape recorded conversations or with the testimony of the other witnesses, many of the other witnesses in this case." A review of the record supports this finding.

After a fairly lengthy argument on this enhancement, the district court judge found, "I don't believe that [Chris] testified truthfully at trial with respect to Clem's or his father's involvement. . . . I think that this defendant has intentionally and methodically attempted to not [implicate] them in these matters." We agree.

The record clearly supports the factual predicate for a finding of perjury, and therefore, an enhancement under the guidelines. The enhancement was proper.

### 2. Acceptance of Responsibility

Chris's next argument is based on our reversal of his enhancement for obstruction of justice. He claims that since the district court erred in imposing the obstruction of justice enhancement, he qualified for a reduction of his sentence for acceptance of responsibility. We review for clear error. *United States v. Partee*, 301 F.3d 576, 580 (7th Cir. 2002).

Application note four to section 3E1.1 of the sentencing guidelines instructs, "[c]onduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." As we discussed above, Chris properly received an enhancement for obstruction of justice.

Application note one, subsection (h), to section 3E1.1 of the sentencing guidelines says, "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility" is an appropriate factor in determining whether the defendant qualifies for the reduction. While it is true that Chris ultimately pleaded guilty to the charges, he did so only after he was convicted in a jury trial. That conviction was reversed "due to an impairment of the defendants' rights of peremptory challenges." *Underwood*, 122 F.3d at 391. Based on his obstruction of justice, and his not-so-timely plea of guilty, we find that the district court did not err in denying Chris a reduction for acceptance of responsibility.

### C. Clement A. Messino ("Clem")

### 1. Fatal Variance

Clem's first argument is that the evidence showed multiple conspiracies as opposed to the one charged in the indictment. Claims of fatal variance, such as this one, are treated as an attack on the sufficiency of the evidence.

*United States v. Williams*, 272 F.3d 845, 863 (7th Cir. 2001). Even if the evidence at trial shows the existence of multiple conspiracies, a fatal variance will not be found if a reasonable juror could have found beyond a reasonable doubt that the defendant was part of the single, charged conspiracy. *Id.* We view the evidence in the light most favorable to the government. *Id.* Furthermore, reversal is required only if the defendant can show that the variance worked to prejudice his defense. *Id.*

When a defendant joins a conspiracy, he joins an agreement, rather than a group. *United States v. Townsend*, 924 F.2d 1385, 1390 (7th Cir. 1991). An agreement need not be explicit; a tacit agreement is sufficient to support a conviction for conspiracy. *United States v. Clay*, 37 F.3d 338, 341 (7th Cir. 1994). There is no bar to using circumstantial evidence in proving the conspiracy's agreement. *Id.* A conspiracy may be shown by evidence which shows that the co-conspirators embraced the criminal objective of the conspiracy, *United States v. Severson*, 3 F.3d 1005, 1010 (7th Cir. 1993), that the conspiracy continued towards its common goal, *United States v. Mojica*, 185 F.3d 780, 787 (7th Cir. 1999), and that there were cooperative relationships, *United States v. Collins*, 966 F.2d 1214, 1221-24 (7th Cir. 1992).

Clem makes too much of the statement, in a previous appeal, that this case presented close questions on whether there was one conspiracy or multiple conspiracies. *Underwood*, 122 F.3d at 391. A close call it may be, but properly left to the jury and the jury ruled against him. *Townsend*, 924 F.2d at 1389.

Clem and Dick were charged in a cocaine distribution conspiracy. Clem argues that they had completely separate cocaine businesses. While it appears that Dick and Clem had separate groups of customers, they relied on each other in obtaining the cocaine for their distribution networks. There were numerous incidents where Clem would run out of

cocaine and buy ounce amounts from Dick. And, there were times when Dick would run out of cocaine and he would buy ounce amounts from Clem. These amounts were generally stop-gap measures, which prevented their respective customers from finding another source of drugs. These stop-gap amounts allowed the distribution networks to flourish.

Dick and Clem used each other's houses in Florida— sometimes as a base of operations and at least once, Dick picked up drugs from Clem's condo. The brothers apparently had free access to each other's houses. They also referred customers to each other and referred each other to suppliers. Finally, there were instances when they would split large amounts of cocaine between themselves.

Chris's arrest in possession of three kilograms of cocaine also supports a single conspiracy. Chris flew down to Florida to pick up cocaine. When he arrived in Florida, he went to Dick's condo and told Dick that he was there to pick up a car for Clem. The evidence shows that Dick knew the purpose of Chris's visit. Dick and Underwood drove Chris to Clem's Florida condo and helped Chris remove a tarp from the car. Shortly thereafter, Chris began his drive back to Chicago; he was arrested and found to be carrying three kilograms of cocaine.

The charge, conspiracy to distribute cocaine, and the evidence show that there was one overarching conspiracy. It is of no import that there were also other conspiracies in action. *Townsend*, 924 F.2d at 1389. The common goal of the conspiracy was to distribute cocaine, and that, in this case, required cooperation between Dick and Clem. As Clem's brief notes, "Factors relevant to determining whether a defendant participated in a conspiracy include whether the defendant's acts rendered support to the co-conspirators, . . . and whether he entered into a cooperative relationship with the co-conspirators to assist in bringing about the objects of the conspiracy." *Citing United States v. James*, 40 F.3d 850,

866 (7th Cir. 1994). The facts show that this is exactly what happened. Without the support of the co-conspirators, Clem could not have obtained or sold as much cocaine as he did.

Contrary to Clem's assertions, Clem and Dick were not in competition—at least not serious competition. If they were competing, either one could have cut the other off— refuse to sell them the stop-gap amounts, prevent the use of each other's Florida residences, and refuse to refer customers and suppliers to each other.

Clem also claims that the transactions between himself and Dick were merely buyer-seller transactions. In *United States v. Duff*, 76 F.3d 122 (7th Cir. 1996), we discussed how to assess whether a relationship is merely buyer and seller.

*Duff* frames the issue as "whether the two groups have agreed to advance a common goal, or whether instead each has an independent objective that it can achieve on its own, or at the expense of the other group." *Id.* at 126. From the discussion above, it is clear that this was not a simple buyer-seller relationship. The brothers' cooperation advanced the common goal of cocaine distribution and they could not have conducted business nearly as well without such cooperation.

Looking at the evidence in the light most favorable to the government, we have no difficulty in holding that a reasonable juror could have found Clem guilty of the single, charged conspiracy.

### 2. Jury Instructions on Multiple Conspiracies

Clem complains of the multiple conspiracy jury instruction given at his trial. "We review a district court's decisions with respect to jury instructions for abuse of discretion, approving on appeal instructions that fairly and accurately summarize the law and have support in the record." *United States v. Jefferson*, 334 F.3d 670, 672 (7th Cir. 2003) (citation

and internal quotations omitted). Clem first argues that his case is distinguishable from the cases which the government relied on in support of the instruction—*United States v. Nava-Salazar*, 30 F.3d 788 (7th Cir. 1994), and *United States v. Wilson*, 134 F.3d 855 (7th Cir. 1998). Secondly, he claims that the phrasing of the instruction lessened the government's burden of proof from that required by *Wilson* and *Nava-Salazar*.

First, while *Nava-Salazar* and *Wilson* are not on all fours with Clem's case, they do deal with sub-conspiracies as a part of a larger, single conspiracy. Both of the cases relied upon to support the instruction dealt with whether multiple drug transactions constituted a single conspiracy or a number of smaller conspiracies. *Nava-Salazar*, 30 F.3d at 795-97; *Wilson*, 134 F.3d at 865-66. Clem attempts to distinguish his case by claiming that the indictment created an "all or nothing" conspiracy, where the jury had to find that Dick and Clem were acting in concert as part of a single conspiracy. The indicted members of the conspiracy included twelve people. Even if one or more had been acquitted, it may well have had no effect on the overall single conspiracy charge as it related to Clem. Moreover, a prosecutor may prove a conspiracy smaller than the one alleged. *United States v. Payne*, 226 F.3d 792, 795 (7th Cir. 2000). The argument made in Clem's brief, that the jury instruction given at trial lessened the government's burden of proof from that required by *Nava-Salazar* and *Wilson*, is an attack on the given instructions for not being a proper statement of law. The given jury instruction properly stated the law and did not lessen the government's burden of proof.

The jury instructions from *Nava-Salazar* and *Wilson*, and the instruction given at Clem's trial were the same in all material respects. If the jury found that there were multiple conspiracies, the jury then had to find that the defendant was part of one of those smaller conspiracies and that the smaller

conspiracy was included in the overarching conspiracy. The thrust of Clem's argument comes from the changing of the words "may find" from the *Nava-Salazar/ Wilson* instruction, to "should find" in his instruction. Either wording is permissive, not mandatory. "Should" may be stronger than "may" but the difference, in practice, is meaningless.

### 3.  Money Laundering Conviction

Clem attacks his conviction for money laundering under 18 U.S.C. § 1956 in relation to his purchase of approximately thirteen acres of real estate. The facts underlying this conviction began when Clem entered into a "verbal deal" to purchase the real estate from John Platek. Over a twelve- to fifteen-month period, Clem made a number of cash payments to Platek in amounts of approximately $7,000 each. Clem received no receipts for these payments. When the $40,000 constituting the purchase price was paid, Clem directed his attorney to "close" on the property. Although Clem was present at the closing, his name appeared nowhere on the documents involved in the sale. Clem's attorney was instructed to prepare a land trust agreement with Kathleen Lewis, Clem's girlfriend, and Mary Beth Messino, Clem's daughter, as the beneficiaries. Clem told Lewis that he intended to build a house on the property.

The relevant question on appeal is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Reynolds*, 64 F.3d 292, 297 (7th Cir. 1995). The money laundering statute requires the government to prove that the transaction in question was designed to conceal the nature, location, source, ownership, or control of the proceeds. 18 U.S.C. § 1956(a)(1)(B)(I). This is the only point Clem argues on appeal.

In *United States v. Esterman*, 324 F.3d 565, 573 (7th Cir. 2003), we reversed and remanded a defendant's convictions

for money laundering. In that case the defendant and a business partner opened a joint bank account. *Id.* at 567. Once the business partner had returned to his native Russia, the defendant withdrew all of the funds in the account and deposited them into properly identified bank accounts he controlled. *Id.* at 567-68. The defendant then made some retail purchases and gave some money to another individual by writing checks from those accounts or by withdrawing cash. *Id.* at 568. We found that these actions were insufficient to show intent to conceal the source of the money. *Id.* at 573. Clem's case presents more compelling evidence of intent to conceal.

In *Esterman* we cited to *United States v. Rockelman*, 49 F.3d 418 (8th Cir. 1995), with approval. That case is closer to the facts of this case—close, but not quite. *Rockelman* began with the son of the defendant's girlfriend and the son's girlfriend dealing with a realtor. *Rockelman*, 49 F.3d at 422. The realtor showed the couple real estate improved with a cabin and the couple's $17,000 offer was accepted. *Id.* The realtor was told "Uncle" Rockelman, the defendant, would pay for the property at closing. *Id.* At the closing, Rockelman paid $16,756 in cash. *Id.* The property was titled in the name of Rockelman's company—ownership of which was a matter of public record. *Id.* The court reversed the conviction for money laundering saying that upholding it would turn the money laundering statute into a "money spending statute." *Id.* (*quoting United States v. Sanders*, 928 F.2d 940, 946 (10th Cir. 1991)). Clem claims that his case is indistinguishable from *Rockelman*. We disagree.

Actually, Clem engaged in a strange real estate transaction; it was an oral sale, paid in cash installments without receipts, where closing did not occur until after the full purchase price had been paid and the land was titled in such a way that Clem's name was not associated with the property. It is also worth noting that the cash transactions were paid in amounts that avoided the reporting requirements of the

Internal Revenue Service. Finally, Clem asserts in his brief that he had no control over the property after closing. Yet, the record indicates that he intended to build a house on the property. This is enough under *Esterman*. *Esterman*, 324 F.3d at 573 (Stating "unusual secrecy surrounding transactions, careful structuring of transactions to avoid attention, folding or otherwise depositing illegal profits into the bank account or receipts of a legitimate business, use of third parties to conceal the real owner, or engaging in unusual financial moves culminating in a transaction" is enough to show intent to conceal). Viewing this evidence in the light most favorable to the government, we find no error in Clem's conviction for money laundering.

### 4. Sentencing

Clem was indicted and convicted prior to the Supreme Court's decision in *Apprendi*. The indictment did not charge any specific amount of cocaine nor did the jury make any findings as to amount of drugs. The district court found that such omissions would not constitute harmless error. After the court made its own findings as to drug amounts, it sentenced Clem to the statutory maximum, as defined and discussed in *Apprendi*. However, the guidelines mandated a higher sentence than that allowed by *Apprendi* because of the amount of cocaine that the district court found to be involved in the conspiracy. The judge then imposed partially consecutive sentences on the conspiracy charge and the money laundering charge to reach the total guideline sentence.

As Clem's jury found no specific amount of drugs, but he was sentenced for over fifty kilograms, his sentence violates the rule announced in *Blakely* and *Booker*. Because we find that the court erred in sentencing Clem based on its own factual findings, we vacate the conspiracy sentence and the consecutive sentence imposed as a result of those findings.

We likewise vacate the enhancements imposed as a result of the judge's findings of fact.

### 5. Criminal Forfeiture

Clem makes a two-pronged attack on the forfeiture finding. First, he argues that the court used the wrong burden of proof for the forfeiture proceedings—a preponderance of the evidence standard as opposed to the beyond-a-reasonable-doubt standard. He supports this argument with *Blakely*. The second argument is that the jury was not required to find a nexus between the underlying criminal activity and the proceeds forfeited. Neither argument requires reversal.

We have previously held that *Apprendi* has no effect on criminal forfeiture proceedings because forfeiture provisions have no statutory maximum. *United States v. Vera*, 278 F.3d 672, 673 (7th Cir. 2002). *Apprendi*'s statutory maximum was supplied by the statute of conviction; *Blakely*'s is external—the statutory maximum is found not in the criminal code, but instead, the sentencing guidelines. *See Booker*, 2004 WL 1535858, at *1. The criminal forfeiture provisions do not include a statutory maximum; they are open-ended in that *all* property representing proceeds of illegal activity is subject to forfeiture. *Vera*, 278 F.3d at 673; U.S.S.G. § 5E1.4; 21 U.S.C. § 853. Therefore, we conclude that *Blakely*, like *Apprendi*, does not apply to forfeiture proceedings.

Although couched in terms of a *Blakely* claim, Clem argues that the jury's use of the preponderance standard at the retrial for forfeiture violated his Sixth Amendment rights. We find that it did not. *Libretti* states that "the nature of criminal forfeiture as an aspect of sentencing compels the conclusion that the right to jury verdict on forfeitability does not fall within the Sixth Amendment's constitutional

protection." *Libretti v. United States*, 516 U.S. 29, 49 (1995). Furthermore, the Supreme Court's decision in *Patterson* explains that, "the Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged." *Patterson v. New York*, 432 U.S. 197, 210 (1977). Since forfeiture is not a separate substantive offense, *Libretti*, 516 U.S. at 39-40, due process is also not offended by a preponderance standard.

Clem's second argument in relation to the forfeiture proceedings is that the court "dispensed with the requirement that the government show a nexus between property subject to forfeiture and the facts of the underlying offenses." Clem is correct in asserting that there must be a connection between the forfeited proceeds and the underlying criminal violations, *Libretti*, 516 U.S. at 42; 21 U.S.C. § 853, but he is wrong in asserting that the court dispensed with this requirement in his case.

Clem's argument is that the court allowed the prosecution to inform the new jury that Clem had been convicted of a drug conspiracy and money laundering. The forfeiture hearing then proceeded by the government reading portions of the trial transcript to the jurors. Clem was allowed to cross-examine the live witness, and he did so. This procedure, Clem says, allowed the jury to find forfeitability without connecting the money to the conduct that resulted in conviction. We disagree.

The jury was repeatedly instructed that they were required to find a nexus between the money and the criminal activity on which the conviction rests. Clem was free to argue, and did, that the money was not connected to the underlying criminal violations. The jury found the property in question to be forfeitable. We find no error.

### III.  Conclusion

To summarize, we vacate Dick's sentence on the conspiracy to distribute cocaine and money laundering charges and remand for resentencing. We also vacate the enhancements applied to his sentence. We affirm Chris's sentence in its entirety. As for Clem's claims, we vacate those parts of his sentence which relate to drug amounts. We also vacate the imposition of enhancements for possession of a weapon during the commission of a drug conspiracy and for being a leader or an organizer. All other issues Clem raised are affirmed.

AFFIRMED in part, VACATED and REMANDED in part with directions.

EASTERBROOK, *Circuit Judge*, dissenting in part. I join the court's opinion and judgment to the extent that it affirms the convictions. I would affirm the sentences as well, for the reasons given in *United States v. Booker*, 375 F.3d 508 (7th Cir. 2004) (dissenting opinion), cert. granted, No. 04-104 (U.S. Aug. 2, 2004). Prudence counsels waiting to see what the Supreme Court says before resentencing, lest a re-resentencing lie in store. One question presented in *Booker* is what to do next if the statutory provisions requiring judges to resolve factual disputes that affect federal sentences should be held unconstitutional. Until the Supreme Court has spoken, not only what to do, but also how to do it, is uncertain. I trust that we will hold the mandate until *Booker*'s final resolution, and that the district judge will sit tight even if we let the mandate go earlier.

One comment on an issue implied rather than addressed in my colleagues' opinion. In supplemental briefs filed after oral argument, the United States contended that the defendants had not adequately preserved an argument based on *Blakely v. Washington*, 124 S. Ct. 2531 (2004), and that our review therefore is limited to a search for plain error. All three members of the panel disagree with that position. Both Dick Messino and Clem Messino advanced in their opening briefs arguments based on *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which led to *Blakely* and *Booker*. True, appellants did not develop these arguments at length in either the district court or their appellate briefs, but the law was so firmly against them that elaboration would have been pointless. When precedent is adverse, a few sentences flagging the point suffice to preserve an argument for resolution by a higher court. Thus the appropriate question (if *Booker* is correct) is whether the error was harmless, and if I were to indulge the assumption that *Booker* got it right I would agree with my colleagues that the error is not harmless.

Still, a claim must be advanced, if it is to be preserved, even when all precedent is contrary. See *Bousley v. United States*, 523 U.S. 614, 622-23 (1998); *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 761-62 n.7 (1984); *Engel v. Isaac*, 456 U.S. 107, 130 n.35 (1982). A point raised belatedly leads to relief only if the standards for plain- error review are met. We know from *United States v. Cotton*, 535 U.S. 625, 631-34 (2002), that an *Apprendi* error does not justify reversal under the plain-error standard because it does not seriously affect the fairness, integrity, or public reputation of judicial proceedings. Although *Cotton* said that the evidence in that case was overwhelming (which may or may not be true of the evidence that led to the Messinos' sentences), it did not imply that any sentence based on a preponderance of the evidence must be vacated, and I see no good reason why it should. Cf. *United States v. Knights*, 534 U.S. 112, 117-18 (2001).

Judges, no less than jurors, resolve factual disputes accurately, and decision under the preponderance standard (the norm before *Booker*) is reliable. That's why the Court held in *Schriro v. Summerlin*, 124 S. Ct. 2519 (2004), that another of *Apprendi*'s sequels does not apply retroactively on collateral review. Although the plain-error standard differs formally from the standard for retroactive application, whether an error gravely undermines the reliability of the outcome is common to the two inquiries. Given *Schriro* and opinions such as *United States v. Watts*, 519 U.S. 148 (1997), we cannot say that judicial resolution of factual disputes on a preponderance is so mistake-prone that reversal is apt under the plain-error standard. It would be weird to hold that a sentencing process used since 1987 with the Supreme Court's approbation (see, e.g., *Edwards v. United States*, 523 U.S. 511 (1998)), plus the support of all federal circuits even after *Apprendi*, now must be deemed so unreliable that it undermines the fairness, integrity, and public reputation of judicial proceedings. Accord, *United States v.*

*Duncan*, 2004 U.S. App. LEXIS 17250 (11th Cir. Aug. 18, 2004) (Guideline sentences based on facts found by judges ought not be set aside under the plain-error standard). Challenges raised initially after the district judge has imposed sentence therefore must fail even if the Supreme Court affirms in *Booker*; but, when *Apprendi*-based arguments have been properly preserved, relief is appropriate because a *Booker* error is not harmless.

A true Copy:

      Teste:

                         _____

                         *Clerk of the United States Court of Appeals for the Seventh Circuit*