DA 13-0151

IN THE SUPREME COURT OF THE STATE OF MONTANA

2014 MT 206

STATE OF MONTANA,

>    Plaintiff and Appellee,

v.

MICHAEL KURT CHILINSKI,

>    Defendant and Appellant.

APPEAL FROM:    District Court of the Fifth Judicial District,
In and For the County of Jefferson, Cause No. DC 11-45
Honorable Loren Tucker, Presiding Judge

COUNSEL OF RECORD:

>    For Appellant:

>    Wade Zolynski, Chief Appellate Defender, Koan Mercer, Assistant Appellate Defender, Helena, Montana

>    For Appellee:

>    Timothy C. Fox, Montana Attorney General, Katie F. Schulz, Assistant Attorney General, Helena, Montana

>    Matthew Johnson, Jefferson County Attorney, Boulder, Montana

>    For Amicus Curiae:

>    William R. Sherman, Nicole B. Neuman, Stijn Van Osch, Latham & Watkins, PLLP, Washington, D.C.
>    (*Pro hac vice Attorneys for the Humane Society of the United States*)

>    David K.W. Wilson, Jr., Robert Farris-Olsen, Morrison, Sherwood, Wilson & Deola, PLLP, Helena, Montana
>    (*Attorneys for the Humane Society of the United States*)

Submitted on Briefs:  May 28, 2014
Decided:  August 5, 2014

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1    Michael Chilinski appeals from his conviction and sentence in the Fifth Judicial District Court, Jefferson County, on 91 counts of animal cruelty. We affirm.

¶2    We restate the issues on appeal as follows:

¶3    1. Did the District Court err in denying Chilinski's motion to suppress?

¶4    2. Did the District Court abuse its discretion in limiting evidence to the time period of the charged offenses?

¶5    3. Did the District Court abuse its discretion in ordering the forfeiture of all of Chilinski's dogs?

## BACKGROUND

¶6    In June 2011, Angelica Sarago reported to the Jefferson County Sheriff's Office (JCSO) that Chilinski's residence had a large Malamute breeding operation. Sarago reported that she had gone to the residence near Jefferson City to purchase a puppy and found that more than 100 dogs were in poor health and the kennels were in poor condition. Law enforcement investigating the call went to Chilinski's residence and observed the kennels were in poor condition. There was an extreme amount of feces (primarily diarrhea), the dogs were matted and ungroomed, there was little food, and the dogs did not have clean water. Further, there was a dead dog in one of the kennels. Law enforcement left the residence, instructing Chilinski to clean up the facility.

¶7    On September 15, 2011, JCSO received another report from Carole and Bill Peterson that Chilinski was neglecting his dogs. Chilinski had just sold the Petersons a Malamute puppy, which Bill Peterson testified was filthy and had a distended belly.

2

Also, the puppy's hip bones and spine were visible through her fur. Peterson chose to purchase the puppy despite her unhealthy appearance because he "felt that if [they] did not purchase that dog that it would die." A veterinarian diagnosed the puppy as malnourished, failing to thrive, and infected with various parasites.

¶8 Chilinski had bred Malamutes for many years, at first as a hobby and later as his primary occupation. Over the prior two years, JCSO had received similar reports from other concerned citizens. In 2009, Chilinski consented to an inspection of his kennels by a veterinarian sent by JCSO. Chilinski maintains that he passed this inspection, although such evidence is not in the record. In 2010, the Humane Society of the United States (HSUS) contacted JCSO about reports that HSUS had received concerning Chilinski's kennels. JCSO discussed with HSUS Chilinski's operation. HSUS informed JCSO that members of its organization would be available to assist with the situation if needed. As JCSO continued to receive complaints, Deputy Hildebrand visited Chilinski's property in both June and August 2011 to conduct further investigation. Hildebrand videotaped these visits.

¶9 In October 2011, Deputy McFadden applied for and obtained a warrant to search Chilinski's kennels and home. The search warrant was issued to McFadden and "any and all agents he may require." The warrant described the evidence to be seized as including "any and all dogs, living or deceased, and unborn," as well as "any and all records pertaining to dogs within the premises including veterinarian bills and records." The warrant also authorized the State to microchip each animal for the sake of maintaining

accurate records and identification, "[d]ue to the extensive number of dogs that may be found."

¶10   McFadden testified that JCSO did not have an animal control officer or sufficient staff to properly and safely execute the warrant, due to the large number of dogs which were potentially sick, injured, and aggressive. Accordingly, JCSO contacted HSUS for assistance and for input on the logistics of executing the warrant. After speaking with the county attorney, JCSO provided HSUS with the videos taken by Hildebrand in June and August 2011 of Hildebrand's visits to Chilinski's property so that HSUS might understand the nature and scope of the situation.

¶11   Following issuance of the warrant, JCSO and the county attorney conducted a meeting to organize the execution of the warrant and to seek assistance from several groups of volunteers. JCSO implemented protocols which were explained to the volunteers. The volunteers did not sign confidentiality agreements, but were advised by JCSO that they were assisting law enforcement and were expected to bring all evidence to a law enforcement officer. Volunteers were instructed to turn over any photographs or videos to the county attorney.

¶12   JCSO received assistance from law enforcement in neighboring jurisdictions, HSUS, local animal shelter volunteers, and two volunteer veterinarians. The veterinarians provided professional opinions about the health and welfare of the dogs, the conditions of the kennels, and whether proper food and water was available, and concluded that the kennels were not suitable for any of the dogs. Upon executing the warrant, law enforcement observed that the kennels were full of feces with no sign of

4

food or fresh water, and many of the kennels were too small. Of the 139 dogs examined, 35 were extremely underweight, 49 were underweight, and 30 showed signs of malnourishment. Many of the dogs had visible scars or other injuries, including missing or damaged ears. Several required immediate veterinary attention for distended abdomens, ear and eye infections, and open wounds. The dogs were systematically removed to a controlled environment where they were fully examined to determine the extent of their illnesses and injuries. McFadden videotaped the property and kennels prior to any dog being seized, and he photographed each dog as it was being seized. Volunteers primarily assisted in the collection of the dogs. Other types of evidence—including cameras, paperwork, photographs, and a computer—were seized by law enforcement officers. Throughout the search, McFadden managed the volunteers by maintaining volunteer rosters, directing volunteers, and holding meetings to ensure everyone knew the proper procedures. JCSO seized 139 adult dogs and 23 puppies.

¶13 On October 18, 2011, Chilinski was charged with one misdemeanor count of cruelty to animals and 91 counts of felony cruelty to animals pursuant to § 45-8-211, MCA. Chilinski moved to suppress evidence obtained from the search on Fourth Amendment grounds, including: the warrant was not supported by sufficient and reliable facts; the warrant was overbroad; and the participation of volunteers was unconstitutional under *Wilson v. Layne*, 526 U.S. 603, 119 S. Ct. 1692 (1999). Chilinski also argued that JCSO violated his fundamental right to privacy under Article II, Section 10 of the Montana Constitution by impermissibly disseminating confidential criminal justice

5

information in violation of § 44-5-303, MCA, and by allowing volunteers to aid in the execution of the warrant.

¶14 A two-day evidentiary hearing on Chilinski's motion was held. The District Court denied the motion to suppress, concluding that probable cause was well established. During the hearing, the State moved to exclude the presentation of evidence at trial regarding the condition of Chilinski's property and kennels prior to June 2011, the date of the first complaint. The District Court granted the State's request to limit evidence to the time period from June 2011 forward, unless Chilinski could establish relevance of the 2009 investigation. On the first day of trial, Chilinski consequently argued that he should be allowed to present evidence from the 2009 investigation, including the testimony of the veterinarian who inspected Chilinski's kennels at that time. Chilinski maintained that the evidence was relevant because it established "justification" for neglect in 2011, when he was facing financial difficulties and health issues, by comparing the condition of the kennels in 2009 when Chilinski was free of financial difficulty and health issues. The court denied Chilinski's motion, stating:

> The only explanation that's provided here is that Defendant would like to present evidence about a time which is not relevant to the time period in which [these] offenses . . . were charged. As I've explained here, the Court is unable to ascertain how it is that Mr. Chilinski's either good conduct or poor conduct at a previous time, that is, a time before 2011 and specifically before June 2011, would tell the jury any probative information about the condition of his kennels in June 2011 and later.

The District Court explained, however, that it would not limit Chilinski's ability to present evidence and argument that his economic and medical adversity provided the justification for the condition of the animals.

6

¶15 Chilinski was convicted by a jury of 91 counts of animal cruelty. The court sentenced Chilinski to the Department of Corrections for a total of 30 years with 25 years suspended, and imposed a prohibition on Chilinski's possessing any animals while on probation. The District Court also ordered the forfeiture of every seized dog, as well as the puppies born after the execution of the warrant.

## STANDARDS OF REVIEW

¶16 In reviewing an order granting or denying a motion to suppress, we determine whether the district court's findings of fact are clearly erroneous and whether those findings were correctly applied as a matter of law. *State v. Dawson*, 1999 MT 171, ¶ 13, 295 Mont. 212, 983 P.2d 916 (citing *State v. Parker*, 1998 MT 6, ¶ 17, 287 Mont. 151, 953 P.2d 692; *State v. Roberts*, 284 Mont. 54, 56, 943 P.2d 1249, 1250 (1997)). We review a district court's evidentiary rulings for abuse of discretion. *State v. Schmidt*, 2009 MT 450, ¶ 27, 354 Mont. 280, 224 P.3d 618 (citing *State v. Damon*, 2005 MT 218, ¶ 12, 328 Mont. 276, 119 P.3d 1194). We exercise plenary review of constitutional issues. *State v. Hantz*, 2013 MT 311, ¶ 18, 372 Mont. 281, 311 P.3d 800.

## DISCUSSION

¶17 As an initial matter, Chilinski argues that the animal cruelty statute, § 45-8-211, MCA, is void for vagueness, and that the District Court violated his due process rights by failing to give a specific unanimity jury instruction. Chilinski concedes that he did not properly preserve these arguments for appeal and asks that we review them on the merits under the plain error doctrine.

¶18 We conduct plain error review "sparingly, on a case-by-case basis," and require the defendant to establish: (1) that the alleged error implicates a fundamental right; and (2) that failing to review the claimed error would result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial, or compromise the integrity of the judicial process. *State v. Evans*, 2012 MT 115, ¶ 25, 365 Mont. 163, 280 P.3d 871 (citing *State v. Wilson*, 2011 MT 277, ¶ 28, 362 Mont. 416, 264 P.3d 1146; *State v. Gunderson*, 2010 MT 166, ¶¶ 99-100, 357 Mont. 142, 237 P.3d 74); *see also State v. Norman*, 2010 MT 253, ¶ 17, 358 Mont. 252, 244 P.3d 737. "'[A] mere assertion that constitutional rights are implicated or that failure to review the claimed error may result in a manifest miscarriage of justice is insufficient to implicate the plain error doctrine.'" *Evans*, ¶ 25 (quoting *Gunderson*, ¶ 100).

¶19 Regarding Chilinski's constitutional challenge to the animal cruelty statute, we construe a statute "to avoid an unconstitutional interpretation whenever possible." *State v. Roundstone*, 2011 MT 227, ¶ 12, 362 Mont. 74, 261 P.3d 1009. Chilinski has not presented an argument concerning § 45-8-211, MCA, that overcomes the presumption of its constitutionality. Moreover, we are not persuaded that failing to review Chilinski's claim of unconstitutionality would result in a manifest miscarriage of justice, as the evidence was overwhelming to prove both the substantive acts of cruelty and that they were "without justification." Concerning the jury instructions, the record shows the following: the parties stipulated to a pattern jury instruction on the requirement of a unanimous verdict, the verdict form instructed the jury to "return unanimous verdicts on each count," and the District Court further explained that the jury must "reach a

8

unanimous verdict on each count individually and separately." In light of this record, Chilinski's argument that the failure to give a specific unanimity instruction calls into question the fundamental fairness of the entire trial is unpersuasive. Although both of these unpreserved claims implicate a fundamental right, Chilinski has failed to establish that the failure to review these claims would result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial or proceedings, or compromise the integrity of the judicial process. *See State v. Taylor*, 2010 MT 94, ¶ 14, 356 Mont. 167, 231 P.3d 79 (citing *State v. Finley*, 276 Mont. 126, 137, 915 P.2d 208, 215 (1996)). As a result, we decline to apply the plain error doctrine to reach the merits of either of these issues.

¶20 ***Issue One: Did the District Court err in denying Chilinski's motion to suppress?***

¶21 Chilinski argues that the District Court erred in denying his motion to suppress for three reasons: (1) the search warrant was unconstitutionally overbroad, (2) volunteers impermissibly aided in the execution of the search warrant, and (3) JCSO impermissibly disseminated confidential criminal justice information in violation of § 44-5-303, MCA.

¶22 First, Chilinski maintains that the warrant's direction to seize "any and all dogs" and "any and all records pertaining to dogs" is impermissibly overbroad in violation of the Fourth Amendment of the United States Constitution and Article II, Section 11 of the Montana Constitution. The Fourth Amendment and Article II, Section 11 require, in part, that a search warrant particularly describe the items it authorizes to be seized. However, "[t]he specificity required of a search warrant may vary depending on the circumstances of the case and the type of items involved." *State v. Seader*, 1999 MT 290, ¶ 13, 297

9

Mont. 60, 990 P.2d 180. "Generic categories or general descriptions of items are not necessarily invalid if a more precise description of the items to be seized is not possible." *Seader*, ¶ 13 (citing *U.S. v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986); *State v. Perrone*, 834 P.2d 611, 616 (Wash. 1992)). In denying Chilinski's motion to suppress, the District Court found that the search warrant "particularly described what was to be seized." We agree. Under the circumstances, it was not possible for the warrant to provide for a more precise description of the dogs and records relating to the dogs due to the sheer size of Chilinski's operation. Chilinski himself was unsure of the exact number of dogs that he owned. The record shows that the warrant did not permit, as Chilinski claims, a "general exploratory rummaging" in Chilinski's belongings, *Seader*, ¶ 11 (citing *Coolidge v. N.H.*, 403 U.S. 443, 467, 91 S. Ct. 2022, 2038 (1971)); rather, it enabled JCSO to "reasonably ascertain and identify the things which [were] authorized to be searched," *Seader*, ¶ 12 (citing *Perrone*, 834 P.2d at 615). As such, we hold that the search warrant was not unconstitutionally overbroad.

¶23 Second, Chilinski takes issue with the volunteer assistance provided in the execution of the search warrant. Relying on the Fourth Amendment claim discussed in *Wilson v. Layne*, 526 U.S. 603, 119 S. Ct. 1692 (1999), and on Article II, Section 11, Chilinski maintains that it is unconstitutional for law enforcement to allow the presence of third parties acting for private purposes in the execution of a warrant. Chilinski argues that HSUS volunteers were acting for private purposes, thereby impermissibly exceeding the scope of the warrant. As a result, Chilinski claims that the exclusionary rule must apply to all evidence that was developed by the volunteers. The State correctly notes,

10

however, that *Wilson* is easily distinguishable from the instant case. In *Wilson*, law enforcement invited a newspaper reporter and photographer on a "media ride-along" when the search warrant was executed. *Wilson*, 526 U.S. at 606-07, 119 S. Ct. at 1695-96. Law enforcement did not solicit the assistance of the reporters prior to executing the warrant, and the reporters did not participate in the execution of the warrant other than to document the event via photographs. In the civil suit that followed, the government attempted to justify its "media ride-along" policy in part by arguing that the presence of the media could help publicize its efforts to combat crime. *Wilson*, 526 U.S. at 612, 119 S. Ct. at 1698. The United States Supreme Court responded that "[s]urely the possibility of good public relations for the police is simply not enough, standing alone, to justify the ride-along intrusion into a private home." *Wilson*, 526 U.S. at 613, 119 S. Ct. at 1698. The Supreme Court thus concluded that the reporters were acting solely for private purposes, and explained that "although the presence of third parties during the execution of a warrant may in some circumstances be constitutionally permissible . . . the presence of *these* third parties was not." *Wilson*, 526 U.S. at 613, 119 S. Ct. at 1699 (emphasis in original).

¶24    In the instant case, the record shows that HSUS and other volunteers were clearly not acting solely for private purposes. Despite Chilinski's claims that HSUS only became involved in order to pursue the private agenda of publicizing the cause of HSUS, the record shows that the volunteers, unlike the reporters in *Wilson*, provided invaluable aid in collecting and inventorying evidence under the direct supervision of law enforcement. As stated above, JCSO did not have an animal control officer, or any other

staff member with knowledge or experience in safely seizing, examining, and placing well over 100 large dogs.

¶25 Further, as the State correctly notes, the warrant was directed to McFadden and "any and all agents he may require" in executing the warrant. Section 46-5-226, MCA, directly authorizes civilians to aid in serving a warrant by stating: "A search warrant must in all cases be served by the peace officer specifically named and by no other person except in aid of the officer when the officer is present and acting in its service." The record shows that the volunteers did indeed aid and act in the service of JCSO, and that McFadden was present and managing the volunteers throughout the execution of the warrant. Chilinski does not argue that volunteers seized any evidence, much less evidence outside of that which was particularly described by the warrant. Instead, he argues that the mere presence of the volunteers impermissibly exceeded the scope of the warrant. Such an argument is contrary to the provisions of § 46-5-226, MCA, and the specific provisions of the instant warrant, and improperly suggests that JCSO could have safely and timely executed this warrant without the assistance of volunteers with specialized knowledge. Thus, we hold that the participation of volunteers in the execution of the search warrant did not violate Chilinski's Fourth Amendment or Article II, Section 11 rights.

¶26 Finally, Chilinski claims that the presence of volunteers violated his right to privacy under Article II, Section 10 of the Montana Constitution. Specifically, Chilinski argues that JSCO violated § 44-5-303, MCA, which generally prohibits the dissemination of confidential criminal justice information, when it allowed non-law enforcement

personnel to assist in executing the warrant and thereby to have access to Chilinski's property and other purported confidential criminal justice information. Chilinski further maintains that JCSO impermissibly disseminated confidential criminal justice information when it sent copies of the two videos taken by McFadden in June and August 2011 to HSUS representatives. Section 44-5-303(1), MCA, provides that "dissemination of confidential criminal justice information is restricted to criminal justice agencies, to those authorized by law to receive it, and to those authorized to receive it by a district court upon a written finding that the demands of individual privacy do not clearly exceed the merits of public disclosure." As discussed above, the warrant was specifically directed to McFadden and "any and all agents [McFadden] may require." Thus, in considering §§ 44-5-303 and 46-5-226, MCA, together with the circumstances of this particular warrant, we conclude that, to the extent there was confidential criminal justice information disseminated, the volunteers were authorized by law to receive such information in order to safely and timely execute the warrant.[1]

¶27  ***Issue Two: Did the District Court abuse its discretion in limiting evidence to the time period of the charged offenses?***

¶28  Chilinski argues that the District Court abused its discretion when it improperly determined that the results of an investigation of his kennels in 2009 were irrelevant pursuant to M. R. Evid. 403. Chilinski maintains that the exclusion of this evidence deprived him of his constitutional right to present a defense. Under M. R. Evid. 403, "the

---

[1] The State raises a credible argument that even if JCSO had violated § 44-5-303, MCA, the proper remedy would not be the application of the exclusionary rule but, rather, a sanction as specifically provided by §§ 44-2-205 and -112, MCA. We need not decide this argument, however, given our analysis above.

13

determination of admissibility is within the discretion of the trial judge and will not be disturbed unless there is manifest abuse of discretion." *State v. Hall*, 244 Mont. 161, 170, 797 P.2d 183, 189 (1990) (citing *Krueger v. Gen. Motors Corp.*, 240 Mont. 266, 275, 783 P.2d 1340, 1346 (1989); *Zeke's Distrib. Co. v. Brown-Forman Corp.*, 239 Mont. 272, 779 P.2d 908 (1989)). "A court abuses its discretion when it acts arbitrarily without employing conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice." *State v. Criswell*, 2013 MT 177, ¶ 42, 370 Mont. 511, 305 P.3d 760.

¶29 Chilinski maintains that evidence of the 2009 kennel inspection was relevant to demonstrate that the conditions of the kennels and dogs in 2011 were justified due to Chilinski's financial hardship and health issues which, in contrast, were absent in 2009. When Chilinski moved to admit evidence of the 2009 inspection during trial, a lengthy discussion ensued in which the District Court questioned the relevance of the inspection. The District Court also pointed out that if Chilinski introduced the 2009 inspection, it would open the door to the State introducing a number of complaints it had received about the condition of Chilinski's kennel during that time as well. In concluding that the 2009 inspection was not relevant, the District Court explained:

> In the event that Mr. Chilinski wishes to provide information to the jury that he was suffering financial reverses or economic hard times during that period [i.e., in 2011] which would prevent him from having conducted things the way apparently he would prefer to have done, then he may do so; but the Court is simply unable to ascertain any kind of cogent connection between a time period when conduct has not been charged, and the time period when offenses are charged.

It is notable that Chilinski nonetheless testified that the 2009 inspection occurred. Chilinski also testified at length about his financial hardships and his health issues including a serious foot injury that made it difficult to care for the dogs. Thus, the record shows that the District Court carefully considered Chilinski's motion and that Chilinski was allowed to present evidence of justification. Chilinski has, therefore, failed to meet his burden in demonstrating that the District Court's actions were arbitrary or exceeded the bounds of reason, resulting in substantial injustice.

¶30 ***Issue Three: Did the District Court abuse its discretion in ordering the forfeiture of all of Chilinski's dogs?***

¶31 Section 45-8-211, MCA, provides the penalty for those found guilty of cruelty to animals as follows:

> (2)(a) A person convicted of the offense of cruelty to animals shall be fined an amount not to exceed $1,000 or be imprisoned in the county jail for a term not to exceed 1 year, or both. A person convicted of a second or subsequent offense of cruelty to animals or of a first or subsequent offense of aggravated animal cruelty shall be fined an amount not to exceed $2,500 or be sentenced to the department of corrections for a term not to exceed 2 years, or both.
> (b) If the convicted person is the owner, the person may be required to forfeit any animal affected to the county in which the person is convicted. This provision does not affect the interest of any secured party or other person who has not participated in the offense.
> (c) For the purposes of this subsection (2), when more than one animal is subject to cruelty to animals, each act may comprise a separate offense.
> (3) In addition to the sentence provided in subsection (2), the court:
>
> . . .
>
> (c) shall prohibit or limit the defendant's ownership, possession, or custody of animals, as the court believes appropriate during the term of the sentence.

¶32 Chilinski does not argue that the dogs found to be victims of animal cruelty were improperly forfeited. Rather, he maintains that the District Court was not authorized to order forfeiture of Chilinski's dogs which were not identified as victims of animal cruelty. He continues that the State failed to prove beyond a reasonable doubt that each of the uncharged dogs was "affected" by Chilinski's actions pursuant to § 45-8-211(2)(b), MCA, and therefore the forfeiture of the uncharged dogs constitutes an impermissible increase in his sentence in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000). Chilinski additionally argues that the forfeiture was procedurally improper because his property was disposed of without giving Chilinski the value of the dogs, or allowing Chilinski himself to give the dogs away.

¶33 The Court's first step in interpreting a statute is to look at its plain language. *State v. Letasky*, 2007 MT 51, ¶ 11, 336 Mont. 178, 152 P.3d 1288. "In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. If legislative intent can be determined by the plain meaning of the words, the Court may go no further in applying any other meaning or interpretation. *State v. Booth*, 2012 MT 40, ¶ 11, 364 Mont. 190, 272 P.3d 89 (citing *State v. Stiffarm*, 2011 MT 9, ¶ 12, 359 Mont. 116, 250 P.3d 300).

¶34 The plain language of § 45-8-211(2)(b), MCA, does not limit the animals that may be forfeited to only those which served as the underlying basis for the substantive charges. The statute specifically provides that "*any* animal affected" may be forfeited (emphasis added). At sentencing, the State argued that the uncharged dogs were also

affected, citing evidence that all dogs suffered from a lack of adequate food, water, and infestations of diseases and parasites. The State also argued that nearly half of the puppies born to seized pregnant dogs died and that this supported the conclusion that all the dogs were affected by Chilinski's neglect. It is notable that several other jurisdictions allow for the forfeiture of any animal owned by a person convicted of animal cruelty, not just an animal knowingly or negligently mistreated or neglected. *See State v. Sheets*, 677 N.E.2d 818 (Ohio 1996) (the trial court did not abuse its discretion in requiring the defendant to forfeit 122 horses even though the defendant was convicted of animal cruelty charges regarding only 10 of the horses); *State v. Barker*, 714 N.E.2d 447 (Ohio 1998) (a defendant convicted of animal cruelty may be required to forfeit all animals as a condition of probation, including those animals that were not the victims of the animal cruelty charges); *Stephens v. State*, 545 S.E.2d 325 (Ga. 2001) (the trial court did not abuse its discretion in requiring the defendant to forfeit 34 dogs, including 9 later-born puppies, even though the defendant was convicted of animal cruelty charges regarding only 17 of the dogs). Thus, the District Court's forfeiture requirement was authorized by the statute.

¶35 Additionally, Chilinski's *Apprendi* argument is misplaced. *Apprendi* dealt with aggravating factors in a crime, and held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S. Ct. at 2362-63. Chilinski relies heavily on the Supreme Court's more recent decision in *Southern Union Co. v. United States*, ___ U.S. ___, 132 S. Ct. 2344 (2012), for the proposition that a jury must find

17

beyond a reasonable doubt that an animal was "affected" for purposes of forfeiture under § 45-8-211(2)(b), MCA. The Supreme Court held in *Libretti v. United States*, 516 U.S. 29, 49, 116 S. Ct. 356, 367-68 (1995), however, that the Sixth Amendment does not require a jury verdict on criminal forfeitures. The Supreme Court has not overruled *Libretti*. Furthermore, criminal forfeiture statutes prescribe no minimum or maximum punishments, which are the primary focus of *Apprendi* and its progeny. As the federal courts have recognized,

> *Apprendi* has no effect on criminal forfeiture proceedings because forfeiture provisions have no statutory maximum. *Apprendi*'s statutory maximum is supplied by the statute of conviction . . . . The criminal forfeiture provisions do not include a statutory maximum; they are open-ended in that all property representing proceeds of illegal activity is subject to forfeiture.

*U.S. v. Messino*, 382 F.3d 704, 713 (7th Cir. 2004); *accord U.S. v. Fruchter*, 411 F.3d 377, 383 (2d Cir. 2005); *U.S. v. Sigillito*, No. 13-1027, ___ F.3d ___, 2014 U.S. App. LEXIS 13729, at *48-49 (8th Cir. Jan. 13, 2014). In *Sigillito*, the Eighth Circuit cites numerous decisions holding that *Southern Union* does not apply to criminal forfeitures and that the right to a jury verdict on forfeitability does not fall within the Sixth Amendment's constitutional protection. The Court of Appeals explains that

> a judge cannot exceed his constitutional authority by imposing a punishment beyond the statutory maximum if there is no statutory maximum. Criminal forfeiture is, simply put, a different animal from determinate sentencing. . . . Thus, although criminal forfeitures are like fines in that they constitute punishment, they are unlike the fine in *Southern Union* that involved a statutory maximum amount.

*Sigillito*, 2014 U.S. App. LEXIS 13729, at *49 (brackets, citations, and internal quotation marks omitted). Accordingly, Chilinski's claim under *Apprendi* fails.

¶36 Finally, in enacting § 45-8-211(2)(b) and (3)(c), MCA, the Legislature granted district courts authority to exercise discretion in imposing the requirement of forfeiture. We review the reasonableness of sentencing conditions for an abuse of discretion. *State v. Ashby*, 2008 MT 83, ¶ 9, 342 Mont. 187, 179 P.3d 1164. In *State v. Zimmerman*, 2010 MT 44, 355 Mont. 286, 228 P.3d 1109, we considered the imposition of a sentencing condition pursuant to §§ 46-18-201(4)(o) and -202(1)(f), MCA (2009), as it related to the ownership of animals. *Zimmerman* dealt with a defendant found guilty of maintaining a public nuisance by feeding and keeping various pets inside a dilapidated house, and also feeding a group of feral cats outside the house. *Zimmerman*, ¶ 3. Zimmerman's deferred imposition of his sentence required him to remove his indoor pets from the county. *Zimmerman*, ¶ 10. Zimmerman challenged the legality of this sentencing condition, and on appeal we upheld the trial court, stating that "[c]onditions imposed by a district court must relate to rehabilitation or protection of society within the particular context of an offender's crime or the unique background, characteristics, or conduct of the offender. *Zimmerman*, ¶ 17 (citations omitted). We concluded that the removal of the pets was reasonably related to protecting citizens from further nuisances. *Zimmerman*, ¶ 18.

¶37 We recognize that the provisions of § 45-8-211(2)(b) and (3)(c), MCA, relate to the penalty that may be imposed by a district court and are not necessarily conditions of a suspended sentence imposed pursuant to §§ 46-18-201(4)(o) and -202(1)(f), MCA (2009). Nevertheless, we may draw from the analysis of *Zimmerman* and similar cases dealing with sentencing conditions in assessing the reasonableness of the District Court's decision to require a forfeiture of Chilinski's animals. Here, the District Court found a

19

number of facts concerning the deplorable conditions that all of the dogs were living in while in Chilinski's care, and concluded "[t]here is no evidence to suggest that returning the animals to Chilinski would change the circumstances which gave rise to their seizure." The court also noted that Chilinski had insufficient funds available to care for the dogs, and that there was no indication Chilinski could provide viable treatment for injury and disease if the dogs were returned to him. Accordingly, given the specific authority granted to a district court by § 45-8-211(2)(b) and (3)(c), MCA, allowing forfeiture of the affected animals, and the discretion afforded a sentencing judge in imposing sentencing conditions, we hold that the District Court did not abuse its discretion in requiring Chilinski to forfeit all of his dogs.

## CONCLUSION

¶38 For the forgoing reasons, we affirm.


/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ JIM RICE

20